UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TYLER BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANGEION GROUP LLC, EPIQ SYSTEMS, INC., and JND LEGAL ADMINISTRATION,<br><br>Defendants. | Case No. 2:25-cv-02079<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Tyler Baker ("Plaintiff"), individually and as a representative of a class of similarly situated persons, brings this action for breach of fiduciary duties, negligence, fraud, breach of implied contracts, and unjust enrichment, against Defendants Angeion Group LLC ("Angeion"), Epiq Solutions, Inc. ("Epiq"), and JND Legal Administration ("JND"), (Angeion, Epiq, and JND are collectively referred to herein as "Defendants"), upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Complaint:

## NATURE OF THE ACTION

1.      Defendants Epiq, JND, and Angeion are leading providers of class action and mass tort settlement administration services. Plaintiff brings this action against Epiq, JND, and Angeion for engaging in a manipulative and deceptive scheme to obtain millions of dollars in undisclosed compensation for serving as the court-approved settlement administrators in hundreds, if not thousands, of mass tort and class action lawsuits across the country.

2.      In their bids, proposals, and agreements for providing settlement administration services, Epiq, JND, and Angeion represent the amount of compensation they expect to receive from providing such services. However, unbeknownst to class counsel, the courts, and the class members in the settlements they administer, Defendants reap huge profits from so-called "revenue sharing" payments for using digital payment cards and gift cards, which they distribute to class members. In reality, these revenue sharing payments are nothing more than kickbacks.

3.      These kickbacks are generated from rebates and revenue sharing arrangements with digital payment companies that cash in on so-called "breakage" – a term used to describe revenue gained by digital payment companies through unredeemed gift cards and digital pay cards that are never claimed.

4.      In order to induce settlement administrators to use digital payment platforms, fintech companies and bank subsidiaries share a portion of the breakage with settlement administrators like Defendants. Defendants have failed to disclose these kickbacks to class members, class counsel, or the courts. Instead, Defendants have taken measures, including forming special purpose entities ("SPEs") to conceal their receipt of kickbacks. Defendants simply pocket the money, nearly all of which is pure profit.

5.      Plaintiff brings this action to bring to light Defendants' clandestine practices, enjoin them from continuing to use kickbacks from digital payments for their own benefit, to obtain an accounting of Defendants' ill-gotten gains, and to compensate the class members for the harm caused by Defendants' improper conduct.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class action exceeds $5,000,000, exclusive of interest

and costs, and Plaintiff as well as numerous Class members are citizens of states other than the state of Defendants' citizenship.

7.     This Court has personal jurisdiction over Defendants because they are corporations that regularly conduct business in this District. In addition, Defendant Angeion is a citizen of this District by virtue of having its principal place of business located in this District.

8.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant Angeion maintains a headquarters in this District and all Defendants regularly conduct business in this District.[1]

### THE PARTIES

9.     Plaintiff Tyler Baker, a citizen of Vermont, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-approved settlement administrators, including (i) *In Re: Automotive Parts Antitrust Litigation*, Case No. 12-md-02311 (E.D. Mich.) (a $1.2 billion settlements administered by Defendant Epiq); (ii) *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.) (a $380.5 million settlement administered by Defendant JND); and (iii) *Lundy v. Meta Platforms, Inc.*, Case No. 18-cv-6793-JD (N.D. Cal.) (a $37.5 million settlement of a data privacy claims against Facebook parent Meta Platforms that was administered by Defendant Angeion).

10.     In connection with these settlements, Plaintiff received digital payments from Defendants. Unbeknownst to Plaintiff, Defendants, and/or their wholly owned subsidiaries, received kickbacks from the issuer of these digital payments. Neither Plaintiff nor the settlement

---

[1] For instance, Defendant JND served as the settlement administrator in *Buescher, et al. v. Brenntag North America, Inc et al.*, Case No. 5:20-cv-00147 (E.D. Pa.), an ERISA class action that was litigated this District.

classes of which he was a member received any benefit from the kickbacks that digital payment companies paid to Defendants.

11.     Defendant Angeion Group is a class action administration company that maintains its principal executive offices at 1650 Arch Street, Suite 2210, Philadelphia, PA 19103. Angeion was one of the first settlement administrators to adopt digital payment methods. On its website, Angeion states that from 2014 to 2016, it "pushe[d] for industry change, advocating for modern communication and **digital payments that eliminate the need for check-cashing stores**." (Emphasis added.)[2] These efforts appear to have paid off, as its website boasts, "In 2022 alone, Angeion sends over 300 million electronic notices to class members and distributes over **10 million digital disbursements**." (Emphasis added.)[3] And for 2024, Defendant Angeion projected that it would "distribute over 20 million digital disbursements."[4]

12.     Defendant Epiq is a Delaware corporation that maintains its principal executive offices at 501 Kansas Avenue, Kansas City, Kansas 66105. Defendant Epiq is one of the largest settlement administration companies in the country.

13.     Defendant JND Legal Administration, a subsidiary of Sedgwick, is a class action administration company that maintains its principal executive offices at 1201 2nd Ave Suite 3400, Seattle, WA 98101. JND's class action services include pre-settlement consultation, notice services, claims processing and validation, call center capabilities, settlement website design, and "an array of distribution services."[5] Pertinent to the instant case, "JND has disbursed billions of

---

[2] *See* https://www.angeiongroup.com/about (last visited on April 23, 2025).
[3] *Id.*
[4] *Id.*
[5] *See* https://www.jndla.com/class-action-administration (last visited April 23, 2025).

dollars in settlement benefits in a wide variety of forms," including "gift cards, vouchers, and electronic benefits."[6]

## SUBSTANTIVE ALLEGATIONS

### Defendants' Class Action Settlement Administration Businesses

14.     Defendants are routinely retained by class counsel, subject to court approval, to provide settlement administration services in class actions and mass tort cases.

15.     Defendants' settlement administration responsibilities and services include (i) gathering and managing data related to class members; (ii) sending out notices to class members to inform them about the terms of the settlement and their options (*e.g.*, submitting a claim, opting out of the settlement class, objecting to the settlement and/or appearing at the final fairness hearing); (iii) receiving and reviewing claim forms submitted by class members; (iv) verifying claimants' eligibility to participate in the settlement; (v) ensuring compliance with court orders; (vi) management of the Qualified Settlement Fund ("QSF") established under Treasury Regulation § 1.468B3(e)(2)(ii), also known as a "Section 468B trust," including opening accounts, reconciling accounts, fund recordkeeping, and ensuring proper tax reporting; and (vii) distributing the settlement funds to eligible class members, typically through checks or other payment methods.

16.     Defendants, as the custodians and administrators of the QSFs, are fiduciaries. As fiduciaries, Defendants have legal and ethical obligations to act in the best interests of the beneficiaries (*i.e.*, the plaintiffs and the class) of the QSF and ensure the funds are managed responsibly and in accordance with the settlement agreement and applicable regulations. *See*, *e.g.*, *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 3586645, at *4 (C.D. Ill. July 3, 2013) (stating, "The oversight of the Settlement Fund is the responsibility of the Settlement Administrator.")

---

[6] *Id.*

17.     To secure court appointments as settlement administrators, Defendants typically submit detailed proposals to class counsel that describe the scope of services they intend to provide, along with an itemized estimate of the associated costs.

18.     Class counsel often solicit competing bids from several settlement administrators. The final selection of the settlement administrator for a given case is based, in large part, on the expected costs of the settlement administration services. This is because the costs of claims administration are typically paid out of the gross settlement fund, which diminishes the funds available for distribution to plaintiffs and the class. In most cases, the compensation paid to the settlement administration company is one of the primary expenses of settlement administration.

### Defendants' Illicit Receipt of Kickbacks from Digital Pay Card Issuers

19.     Unbeknownst to the attorneys who have retained Defendants as administrators to provide settlement administration services and the courts who have approved of the selection of Defendants as administrators, the amount of compensation Defendants receive for providing settlement administration services is secretly augmented by kickbacks they receive from issuers of digital payment cards and gift cards. This results in Defendants' receipt of compensation that significantly exceeds the amounts they have disclosed to the parties and the courts.

20.     As noted above, Defendants serve in a fiduciary capacity as the trustee and custodian of the QSF, which they are obligated to manage, supervise, and administer for the benefit of the class.

21.     Until just a few years ago, payments in virtually all class action and mass tort settlements went out by mail in the form of a paper check, which required settlement administrators, like Defendants, to print, mail, and track tens of thousands (or hundreds of thousands) of checks. This was followed by stale-dating and/or reissuing a significant portion of

the checks that went uncashed. Payees, for their part, needed a mailing address to receive checks and a way to cash them, which excluded those without fixed residences or bank accounts.

22.     In recent years, however, settlement administrators, like Defendants, have transitioned away from issuing checks to class members to mailing (or emailing) digital disbursements, including prepaid cards and gift cards. According to one report, "The number of times digital payments are selected is growing at a faster rate than the number of cases in which digital payments are offered. From 2020 to 2022, the number of cases grew by a factor of 10, while the number of payment selections grew by a factor of more than 68."[7]

23.     Digital disbursements are touted for having higher payment success rates than paper checks.[8] Also, issuers of digital payments report that payees generally prefer digital payments. For example, they report that in cases where payees have a choice between paper checks and digital payments, as much as 91 percent of class members have elected to receive a digital payment.[9]

24.     Digital payments are also touted for having a lower cost to send a payment to a U.S.-based payee than the cost to print and mail a paper check.

25.     Defendants' digital payments are outsourced to fintech firms and/or subsidiaries of banks that issue all the prepaid cards and gift cards for a particular settlement.

26.     Generally speaking, there are two types of digital payment cards: open-loop and closed-loop.

    a)     A closed-loop card is a digital payment card that can only be used at a specific retailer or company. The card will typically display the company's

---

[7] *See 2023 ANNUAL REPORT, Digital Payments in Class Actions and Mass Torts*, at p. 7, available at https://www.westernalliancebancorporation.com/sites/default/files/2023-10/2023-wab-dd-digital-payments-report.pdf (last visited on April 23, 2024).

[8] *See id.* at p. 5.

[9] *See id.* at p. 8.

logo, such as Amazon or Target, indicating where it is accepted, but not the logo of a card network, such as MasterCard or Visa.

b)      An open-loop card is a general-purpose digital payment card that can be used anywhere the brand of card is accepted. It typically bears the logo of the card brand or network that processes the actual transactions, such as Visa, Mastercard, American Express, or Discover.

27.    Fintech companies that issue closed-loop payment cards receive substantial rebates from the retailer where the card can be used. For example, if a fintech company obtains cards from Amazon, Amazon will provide a rebate to the digital pay card issuer (*e.g.*, offering a $10 rebate on a $100 digital pay card). Digital pay card issuers, who compete for business from class action settlement administration companies, split the $10 rebate with the settlement administrator. In the example of the $100 Amazon pay card, the digital pay card company retains half of the rebate (*i.e.*, $5), and it kicks back the other $5 to the Defendants.

28.    For open-loop digital pay cards, the rebates are smaller, and it takes longer for the rebates to accrue. However, even a one or two percent rebate on a multimillion-dollar settlement results in substantial compensation for the Defendants.

29.    The issuers of digital payment cards are able to offer such rebates because of "breakage," which is a term used to describe revenue gained by retailers through unredeemed gift cards and digital payment cards that are never claimed. In these cases, the retailers pocket the money paid for these prepaid cards. Nearly all of this money is considered to be profit for the retailers.

30.    The profits from breakage enable fintech companies, like Tremendous and Blackhawk Network, to promote their digital payment cards as a no-cost service. For example, on

its LinkedIn page, Tremendous states, "Plus, **we're free to use**. You only spend what you send." (Emphasis added.)[10]

31.    As an example of how breakage works, if a customer purchases a $50 gift card, the company receives $50, as well as a future liability for $50 worth of goods or services. This could be for a clothing retailer, a restaurant chain, or any other merchant that offers such gift card programs. If the recipient of the gift card uses it to make a $47 purchase, then the company would remove $47 from its liability, which would be recognized as revenue. If, after the purchase, the customer discards the gift card, the $3 left on it would never be used. That leftover amount is considered breakage.

32.    The kickbacks Defendants receive from digital pay cards and gift cards represent an undisclosed windfall for Defendants, as it is already being paid in full for providing settlement administration services to the class. So, it is no surprise that Defendants did not disclose these payments to settlement class counsel or the courts.

33.    To conceal these kickbacks, on information and belief, Defendants have created one or more wholly owned special purpose entities or "SPEs" that receive the undisclosed payments. These SPEs – and their covert purpose – are not disclosed to settlement class counsel or the courts.

34.    Defendants have failed to turn over the kickbacks from digital payments to the QSFs that they administer, and they have failed to use these payments for the benefit of the plaintiffs and the class by applying them to reduce settlement administration expenses.

35.    Defendants have regularly and systematically misrepresented the amount of compensation they would receive by providing class action and mass tort settlement administration

---

[10] *See* https://www.linkedin.com/company/tremendous-rewards/about/ (last visited April 23, 2025).

services in the bids, estimates, and proposals they provide to class counsel in order to secure such work, as well as in the contracts, agreements, and engagement letters they have disseminated to class counsel.

36.     Defendants have provided bids, estimates, and proposals for settlement administrative services to class counsel with the intent and expectation that class counsel would rely upon such communications. As a result of such reliance, Defendants have caused numerous class counsel to submit briefs and other materials to various state and federal courts that misstated and underreported the amount of compensation Defendants would receive by providing settlement administration services by concealing the revenue and earnings that Defendants have received from digital payments.

37.     At all times, Defendants concealed from class counsel and the courts that they would receive substantial kickbacks from issuers of digital payments and that such kickbacks rendered Defendants' representations about the compensation they would receive for providing settlement administration services materially false and misleading.

38.     Class counsel and the courts that approved Defendants' appointments as settlement administrators could not have known or discovered Defendants' illicit compensation from kickbacks from digital payment companies.

### Tremendous Digital Payments

39.     Defendant Epiq enlisted Tremendous, a business-to-business issuer of gift cards, to issue digital payments in the settlement of *In Re: Automotive Parts Antitrust Litigation*, No. 12-md-02311 (E.D. Mich.), a multidistrict antitrust class action that has resulted in $1.2 billion in settlements.

40.     There were five rounds of distributions to settlement class members. On information and belief, Epiq has administered each round of settlements and distributions. Pursuant to the court's approval, the Round 1 Settlements totaled approximately $225 million; the Round 2 Settlements totaled approximately $379 million; the Round 3 Settlements totaled approximately $433 million; the Round 4 Settlements totaled approximately $184 million, and the Round 5 Settlements totaled $3.154 million.

41.     Epiq digital payments were sent to settlement class members who were eligible for payments from noreply@Epiqpay.com, which provided a "Claim Payment" link to claim their payment. Epiq did not provide any digital payment options other than EpiqPay. Epiq describes EpiqPay as follows:

> EpiqPay is the official digital payment platform for Epiq Class Action and Claims Solutions. EpiqPay offers individuals who are eligible to receive payments in mass actions an easy, convenient, fast, and secure way to claim their payments.[11]

42.     Through Defendant Epiq's administration of this settlement, Plaintiff received a $75.00 Amazon.com gift card via email from Tremendous.

43.     On its website, Tremendous claims to have provided digital payment solutions for 150 cases and disbursed $350 million to 5.5 million claimants. On its LinkedIn page, Tremendous boasts, "We handle everything related to international sending, so you can issue rewards to recipients in over 200 countries. And you can give them the gift of choice: we offer 1,000 different redemption options."[12]

---

[11] *See* https://www.autopartsclass.com/faq (last visited April 23, 2025).

[12] *See* https://www.linkedin.com/company/tremendous-rewards/about/ (last visited April 23, 2025).

*Blackhawk Network Digital Payments*

44.    Defendant JND enlisted Blackhawk Network to issue digital payments in the settlement of *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.).

45.    Blackhawk Network is a leading issuer of digital payment cards for so-called "corporate payouts," including class action claims. Blackhawk Network offers prepaid cards and gift cards, which can be delivered via mail or digitally via email. Numerous class action settlement administrators, including Defendant JND, have adopted digital payment platforms like Blackhawk Network and Digital Disbursements.

46.    Plaintiff received one or more digital prepaid cards from Blackhawk Network in the Equifax Data Breach Settlement, including a Redistribution of Remaining Funds that was sent to Plaintiff on December 22, 2024, which he redeemed on Blackhawk Network's redemption website: https://www.myprepaidcenter.com/home.

47.    The Equifax Inc. data breach, which occurred on September 7, 2017, impacted the personal information of about 147 million Americans. More than 300 class actions were filed. Those cases were transferred and consolidated in the U.S. District Court for the Northern District of Georgia.

48.    The Northern District of Georgia appointed JND as the settlement administrator for the Equifax Data Breach Settlement. *See In re Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT, ECF No. 742, p. 5 (N.D. Ga. July 22, 2019) (stating JND "is appointed as the settlement administrator, with responsibility for claim submissions, certain notice functions, and administration pursuant to the terms of the settlement agreement."

With respect to compensation, the court stated, "The settlement administrator's fees, as approved by the parties, will be paid from the settlement fund pursuant to the settlement agreement." *Id*.

49.     The *Equifax* case was a massive settlement that provided for a common fund of $380,500,000 for class benefits, attorneys' fees, expenses, service awards, and, pertinent to this matter, notice and administration costs. The settlement further provided for an additional $125,000,000 if needed to satisfy claims for certain out-of-pocket losses, and potentially $2 billion more if all 147 million class members signed up for credit monitoring.

50.     In approving JND, the court noted that the company possessed the capacity to handle the administration of extremely large settlements, including calculating payments, stating:

> The claims administrator, JND, is highly experienced in administering large class action settlements and judgments, and it has detailed the efforts it has made in administering the settlement, facilitating claims, and ensuring those claims are properly and efficiently handled. Among other things, JND has developed protocols and a database to assist in processing claims, calculating payments, and assisting class members in curing any deficient claims. Additionally, JND has the capacity to handle class member inquiries and claims of this magnitude. This factor, therefore, supports approving the relief provided by this settlement.

Amended Final Approval Order, at No. 1:17-md-02800-TWT, at ECF No. 1029, p. 7 (citations to the record omitted).

51.     There is nothing in the record to indicate that the court or class counsel were aware that JND and/or a subsidiary thereof would receive kickbacks from Blackhawk Network for agreeing to distribute payments using its digital payment platform. As settlement administrator, JND "received in excess of 15 million claims from verified class members." Amended Final Approval Order, No. 1:17-md-02800-TWT at ECF # 1029 (March 17, 2020). Given the large number of claims made in this action and the value of the settlement, the payments from Blackhawk to JND would have been substantial and material to JND's financial results.

*Digital Disbursements Payments*

52.    Angeion Group enlisted Digital Disbursements, a subsidiary of Western Alliance Bank, to issue digital payments in the case of *Lundy v. Meta Platforms, Inc*., Case No. 18-cv-6793-JD (N.D. Cal.), a $37.5 million settlement of the location data privacy class action against Meta Platforms, the parent company of Facebook. Digital Disbursements is yet another issuer of digital payments, including prepaid cards.[13]

53.    In *Lundy v. Meta Platforms, Inc*., Case No. 18-cv-6793-JD (N.D. Cal.), plaintiffs alleged that Meta improperly inferred the location of Facebook users through their IP addresses even if the Facebook user had turned off the Location Services on their phone. The parties reached a settlement pursuant to which Meta would pay $37.5 million for a release of the class's claims.

54.    By order entered on April 26, 2023, the court granted preliminary approval of the settlement and appointed Angeion Group as the settlement administrator. *Lundy v. Meta Platforms, Inc*., Case No. 18-cv-6793-JD, at ECF No. 199, p. 3. Pursuant to this order, Angeion Group was required to give notice to the class under the court-approved notice plan, review claims submitted by class members, process claims, and distribute the net settlement fund to the class. *Id*. The cost of the settlement notice and administration was to be paid from the gross settlement fund. *Id*.

55.    Plaintiff received a prepaid Mastercard in the amount of $62.60 from Digital Disbursements in the *Lundy v. Meta Platforms, Inc*., location privacy class action settlement, in or around December 2024.

56.    On September 5, 2024, class counsel submitted a post-distribution accounting and motion for *cy pres* distribution, which included a declaration for Defendant Angeion, which

---

[13] Western Alliance Bank acquired Digital Settlement Technologies, d/b/a Digital Disbursements, in January 2022. *See* https://www.pymnts.com/news/partnerships-acquisitions/2022/western-alliance-buys-payments-platform-digital-disbursements/ (last visited on April 23, 2024).

reported that out of 906,299 claims made by class members, 887,685 payments were distributed to class members by "Digital Method." Administrator's Post Distribution Accounting Report, Case No. 3:18-cv-6793-JD, ECF No. 227-1, p. 2. The total value of Digital Payments Cashed was $28,076,451.57. *Id*. p. 3. Angeion also reported that the total settlement administration costs were $1,254,734.26. *Id*. Although it is believed that Defendant Angeion received kickbacks from Digital Disbursements for using its digital payment platform to distribute settlement funds, Defendant Angeion did not disclose receiving any payment from Digital Disbursements.

## CLASS ALLEGATIONS

57.    Plaintiff brings all counts, as set forth below, individually and as a Class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class defined as:

> All persons in the United States who were members of a settlement class in which Defendants provided claims administration services and distributed qualified settlement funds via digital payment cards, gift cards, and prepaid cards (the "Class").

58.    Excluded from the Class are Defendants, their subsidiaries and affiliates, officers and directors, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

59.    This proposed Class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the Class definition in an amended pleading or when they move for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

60.    **Numerosity – Fed. R. Civ. P. 23(a)(1):** The Plaintiff is informed and believes, and thereon alleges, that there are, at minimum, hundreds of thousands of members of the Class

described above. The exact size of the Class and the identities of the individual members are identifiable through Defendants' records.

61.    The Class is readily ascertainable from Defendants' business records, which identify the class members of each and every case in which Defendants have served as settlement administrators, and such records also include contact information such as mailing addresses, email addresses, and telephone numbers.

62.    **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a)    Whether Defendants were fiduciaries with respect to Plaintiff and the Class;

b)    Whether Defendants breached their fiduciary duties to Plaintiff and the Class;

c)    Whether Defendants breached their contracts for claims administration services;

d)    Whether Defendants entered into contracts implied in fact with Plaintiff and the Class;

e)    Whether Defendants were unjustly enriched by receiving undisclosed kickbacks from digital payment card issuers;

f)    Whether Plaintiff and Class members are entitled to damages as a result of Defendants' wrongful conduct; and

g)    Whether Plaintiff and Class members are entitled to restitution as a result of the Defendants' wrongful conduct.

63.    **Typicality – Fed. R. Civ. P. 23(a)(3):** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the

same legal theories and arise from the same unlawful and willful conduct. Plaintiff and the Class were all members of a settlement class in which Defendants provided claims administration services and distributed qualified settlement funds via digital payment cards, gift cards, and prepaid cards.

64.    **Adequacy of Representation – Fed. R. Civ. P. 23(a)(3):** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

65.    **Predominance and Superiority – Fed. R. Civ. P. 23(b)(3):** The proposed Class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members. Also, a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

66.     Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

67.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

68.     Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class members' names, email addresses, and mailing addresses from the class action settlements they administered. Defendants have already preliminarily identified Class members for the purpose of sending notices of class action settlements and distributing digital payment cards.

## CLAIMS FOR RELIEF

### COUNT I

### BREACH OF FIDUCIARY DUTIES AS TO ALL DEFENDANTS

69.     Plaintiff repeats all previous allegations as if set forth in full.

70.     Plaintiff brings this claim individually and on behalf of the Class.

71.     As the court-appointed and/or court-approved mass tort and class action settlement administrator in numerous cases, Defendants owed Plaintiff and the Class utmost fiduciary duties of prudence, care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate material disclosures to the courts, class counsel, Plaintiff and the Class.

72.     At all relevant times, Defendants were court-approved and duly appointed fiduciaries of QSFs created for the benefit of class members in various class action settlements, in that they exercised discretionary authority or control over the administration and/or management of such QSFs or the disposition of QSFs' assets.

73.     As fiduciaries of QSFs, Defendants were subject to certain fiduciary duties, including the duties of care and loyalty with respect to managing the assets of QSFs for the sole and exclusive benefit of the Class members in cases where Defendants served as settlement administrators. In particular, Defendants were obligated to act with the care, skill, diligence, and prudence under the circumstances that a prudent and loyal person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

74.     Defendants breached these fiduciary duties in multiple respects, as discussed throughout this Complaint. Defendants did not act or make decisions concerning the management of the various QSFs based solely on the interests of the Class members. Instead, Defendants placed their own financial interests before those of the Class members by entering into clandestine agreements with digital payment companies for the purposes of receiving kickbacks and other financial incentives that were retained by Defendants and/or their wholly owned subsidiaries rather than being used to benefit the classes in the settlements Defendants were charged with administering.

75.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial.

76.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the members of the Class were denied the benefit of the revenue generated by using digital payments, which Defendants could have used to offset the costs of settlement administration.

77.     Defendants are liable to restore to each QSF all losses caused by their breaches of fiduciary duties and also must restore any profits Defendants received as a result of such breaches.

78.     In addition, Plaintiff and the Class are entitled to equitable relief, including equitable accounting, and other appropriate relief for Defendants' breaches, as set forth in their Prayer for Relief.

## COUNT II

### FRAUD AS TO ALL DEFENDANTS

79.     Plaintiff repeats all previous allegations as if set forth in full.

80.     Plaintiff brings this claim individually and on behalf of the Class.

81.     Defendants falsely represented the compensation they would receive for providing settlement administration services in class actions and mass tort cases in their bids, proposals, agreements, and contracts for providing settlement administration services. In particular, Defendants omitted and failed to disclose the compensation they would receive from digital payment companies in the form of kickbacks.

82.     At all times relevant to this action, the amount of compensation paid to a settlement administrator was material to class counsel in its selections of settlement administrators because this compensation would be paid out of the gross settlement proceeds and diminish the amount of money available to compensate the plaintiffs and the classes in such cases.

83.     At all times relevant to this action, Defendants knew or recklessly disregarded the falsity of their representations in their bids, proposals, agreements, and contracts concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

84.     At all times relevant to this action, Defendants intended to deceive class counsel in the decision-making process for selecting settlement administrators and to deceive the courts in the approval process for settlement administration.

85.     Defendants intended to induce class counsel's and the court's reliance and their false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

86.     Class counsel and the courts did, in fact, rely upon Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases, and on the basis of such misrepresentations, selected Defendants as the settlement administrators for dozens if not hundreds of class actions and mass tort cases.

87.     Class counsel's and the courts' reliance on Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases was at all times reasonable. Indeed, no amount of diligence on the part of class counsel or the courts would have revealed Defendants' deceptive scheme.

88.     Reliance upon Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases caused actual financial harm and damage to Plaintiff and the members of classes in dozens if not hundreds of cases, who would have received greater recoveries in such settlements if the kickbacks that Defendants received from digital payment companies had been used by Defendants to offset settlement administration expenses rather than to line Defendants' own pockets.

89.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT III

## NEGLIGENT MISREPRESENTATION AS TO ALL DEFENDANTS

90.    Plaintiff repeats all previous allegations as if set forth in full.

91.    Plaintiff brings this claim individually and on behalf of the Class.

92.    For purposes of this count only, in the alternative, Plaintiff specifically disclaims any allegations of fraud and alleges only negligence.

93.    As set forth herein, each of the Defendants had a duty to fully and truthfully disclose the compensation they would receive for providing settlement administration services in class actions and mass tort cases in their bids, proposals, agreements, and contracts for providing settlement administration services.

94.    In breach of this duty, Defendants falsely represented the compensation they would receive for providing settlement administration services in class actions and mass tort cases in their bids, proposals, agreements, and contracts for providing settlement administration services. In particular, Defendants omitted and failed to disclose the compensation they would receive from digital payment companies in the form of kickbacks.

95.    At all times relevant to this action, the amount of compensation paid to a settlement administrator was material to class counsel in its selections of settlement administrators because this compensation would be paid out of the gross settlement proceeds and diminish the amount of money available to compensate the plaintiffs and the classes in such cases.

96.    At all times relevant to this action, Defendants negligently disregarded the falsity of their representations in their bids, proposals, agreements, and contracts concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

97.     As alleged herein, Defendants made multiple false and misleading representations and omissions of material facts that they should have known were incorrect, incomplete, and misleading.

98.     Defendants occupied a special position of confidence and trust such that class counsel's and the courts' reliance on their statements was, at all times, reasonable and foreseeable. Put another way, Defendants had a duty to speak truthfully and with care in these circumstances, where the relationship is such that, in moral and good conscience, class counsel and the courts had the right to rely on Defendants for accurate and correct information, and their reliance was reasonable.

99.     Defendants knew or should have known that class counsel and the courts would rely on their false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases.

100.    Class counsel and the courts did, in fact, rely upon Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases, and on the basis of such misrepresentations, selected Defendants as the settlement administrators for dozens if not hundreds of class actions and mass tort cases.

101.    Class counsel's and the courts' reliance on Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases was at all times reasonable. Indeed, no amount of diligence on the part of class counsel or the courts would have revealed the falsity of Defendants' misrepresentations.

102.    Reliance upon Defendants' false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions and mass tort cases caused actual financial harm and damage to Plaintiff and the members of classes in dozens, if not hundreds, of cases. Plaintiff and the Class would have received greater recoveries in such settlements if the kickbacks that Defendants received from digital payment companies had been used by Defendants to offset settlement administration expenses rather than to line Defendants' own pockets.

103.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT IV

### NEGLIGENCE AS TO ALL DEFENDANTS

104.    Plaintiff repeats all previous allegations as if set forth in full.

105.    Plaintiff brings this claim individually and on behalf of the Class.

106.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in managing and administering QSFs in mass tort and class action settlements.

107.    Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

108.    Defendants had a common law duty to manage and administer mass tort and class action settlements with reasonable care. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any improper practices on the part of the Defendants. By receiving payments from the proceeds of settlements of mass tort and class action settlements for their companies, Defendants were obligated to act with reasonable care in their management and administration of QSFs.

109.    Defendants' duty also arose from the fact that they hold themselves out as a trusted provider of class action administration services and thereby assume a duty to reasonably manage QSFs.

110.    Defendants breached the duties owed to Plaintiffs and Class members and were thus negligent. Defendants breached their duties through the acts and omissions alleged herein.

111.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class members, the costs of administering the class action settlements in which they participated would have been substantially less than the amounts Defendants charged.

112.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have suffered financial loss. Injuries.

113.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## <u>COUNT V</u>

### **BREACH OF IMPLIED CONTRACT AS TO ALL DEFENDANTS**

114.    Plaintiff repeats all previous allegations as if set forth in full.

115.    Plaintiff brings this claim individually and on behalf of the Class.

116.    When Plaintiff and Class members elected to receive digital payments from Defendants in mass tort and class action settlements, they entered into implied contracts with Defendants, under which Defendants agreed to take reasonable steps to manage and administer the QSF in the interest of Plaintiff and Class members, comply with statutory and common law duties in the management of QSFs, and to disclose to Plaintiff, the Class, class counsel and the courts the compensation Defendants received or would receive for providing such services.

117.    Defendants induced and invited Plaintiff and Class members to choose digital payments as part of Defendants' provision of services. Plaintiffs and Class members accepted Defendants' offers and selected digital payments rather than receiving checks.

118.    When entering into implied contracts, Plaintiff and Class members reasonably believed and expected that Defendants would manage and administer the QSFs solely for their benefit and in compliance with their statutory and common law duties to Plaintiff, the Class, class counsel, and the courts.

119.    Defendants received court-approved compensation for providing settlement administration services that did not include kickbacks or remuneration from digital payment companies. Plaintiff, the Class, class counsel, and the courts reasonably believed and expected that Defendants' total compensation for providing settlement administration services would be limited to the amounts disclosed in Defendants' bids, proposals, contracts, and agreements with class counsel.

120.    Plaintiff, the Class, class counsel, and the courts would not have agreed to engage Defendants had they known that Defendants would enter into clandestine transactions with digital payment companies in order to reap illicit kickbacks.

121.    Plaintiff, the Class, class counsel, and the courts fully performed their obligations under their implied contracts with Defendants.

122.    Defendants breached their implied contracts with Plaintiff, the Class, class counsel, and the courts by failing to disclose the compensation they received from digital payment companies and by failing to use such compensation to benefit Plaintiff and the Class, such as using revenue from digital payments to offset settlement administration expenses.

123.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT VI

### UNJUST ENRICHMENT AS TO ALL DEFENDANTS

124.    Plaintiff repeats all previous allegations as if set forth in full.

125.    Plaintiff brings this claim individually and on behalf of the Class.

126.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

127.    Defendants either benefited financially from the improper conduct alleged herein, including but not limited to the illicit and undisclosed compensation or remuneration Defendants received from digital payment transactions that were unjust in light of Defendants' bad faith conduct.

128.    Plaintiff and the Class seek restitution from Defendants and seek an order from this Court disgorging all profits, including from digital payment transactions obtained by the Defendants due to their wrongful conduct.

129.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

A.    For an Order certifying this action as a Class action and appointing Plaintiff as a Class Representative and his counsel as Class Counsel;

B.      For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the solicitation and receipt of kickbacks from digital payment companies;

C.      For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to digital payments;

D.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F.      For an award of punitive damages, as allowable by law;

G.      For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

H.      Pre- and post-judgment interest on any amounts awarded; and

I.      Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

A jury trial is demanded by Plaintiffs on all claims so triable.

Dated: April 24, 2025

By   */s/Eric Lechtzin*
Eric Lechtzin (PA ID # 62096)
Marc H. Edelson (PA ID # 51834)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
medelson@edelson-law.com
elechtzin@edelson-law.com

*Attorneys for Plaintiff and the Proposed Class*